KYRA KAZANTZIS (STATE BAR NO. 154612)
ANNETTE KIRKHAM (STATE BAR NO. 217958)
JESSICA FRY (RLSA NO. 800918)
**LAW FOUNDATION OF SILICON VALLEY**
111 West Saint John Street, #315
San Jose, CA  95113
Telephone:  (408) 280-2458
Facsimile:  (408) 293-0106
Email:  jessicaf@lawfoundation.org;
kyrak@lawfoundation.org;
annettek@lawfoundation.org

WILLIAMS J. GOINES (STATE BAR NO. 61290)
KAREN ROSENTHAL (STATE BAR NO. 209419)
CINDY HAMILTON (STATE BAR NO. 217951)
**GREENBERG TRAURIG LLP**
1900 University Avenue, Fifth Floor
East Palo Alto, CA 94303
Telephone:  (650) 328-8500
Facsimile:  (650) 328-8508
Email:  goinesw@gtlaw.com; rosenthalk@gtlaw.com
          hamiltonc@gtlaw.com

Attorneys for Plaintiffs

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>LINDA DUNG NGOC TRAN,<br><br>Debtor. | Bankruptcy Case No. 09-54184<br><br>(Chapter 7) |
| MARIA A. GARVIN, JESUS ARREOLA, ANTONIA ARREOLA, RAFAEL M. BRAVO, TOMAS HERNANDEZ, MARTHA HERNANDEZ, JUAN RAMIREZ, MARIA C. RAMIREZ, EUGENIO RAMOS, COLUMBA RAMOS, PROSPERO TORRALBA, CIRILA TORRALBA, RAUL TORRES, and RAUL GONZALEZ,<br><br>        Plaintiffs,<br><br>v.<br><br>LINDA DUNG NGOC TRAN,<br><br>        Defendant. | Adv. Pro. No. _____<br><br>**COMPLAINT OBJECTING TO DISCHARGE**<br>[11 U.S.C. § 727(c)]<br><br>**COMPLAINT OBJECTING TO DISCHARGEABILITY OF A DEBT**<br>[11 U.S.C. § 523 (a)(2)(A)]<br>[11 U.S.C. § 523 (a)(4)]<br>[11 U.S.C. § 523 (a)(6)]<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs, MARIA A. GARVIN, JESUS ARREOLA, ANTONIA ARREOLA, RAFAEL M. BRAVO, TOMAS HERNANDEZ, MARTHA HERNANDEZ, JUAN RAMIREZ, MARIA C. RAMIREZ, EUGENIO RAMOS, COLUMBA RAMOS, PROSPERO TORRALBA, CIRILA TORRALBA, RAUL TORRES, and RAUL GONZALEZ, respectfully represent:

1. Plaintiffs are creditors of the Defendant herein.

2. Defendant is the Debtor in Case No. 09-54184

3. This is an adversary proceeding in which Plaintiffs are objecting to the dischargeability of a debt of Defendant and to the discharge of the discharge of Defendant. The Court has jurisdiction of this adversary proceeding pursuant to 28 U.S.C. section 1334 and 11 U.S.C. section 727. This is a core proceeding under 28 U.S.C. section 157(b) and 28 U.S.C. section 157(b)(2)(J).

4. On March 20, 2007, Plaintiffs filed a complaint in the United States District Court for the Northern District of California entitled Garvin, et al., v. Tran, et al., Case No. C-07-01571 RS ("Federal Court Action"). Defendant Linda Dung Ngoc Tran ("Tran") was named as Defendant in the Federal Court Action.

5. Defendant Tran filed a voluntary petition for relief under Chapter 7 of the United States Bankruptcy Code on May 29, 2009.

6. The last day to file complaints pursuant to 11 U.S.C. § 523(c) is September 24, 2009.

I. **PARTIES**

7. Plaintiff Maria Argentina Garvin is a Hispanic woman who traces her national origin to Mexico. At all relevant times alleged herein, Maria Argentina Garvin was over the age of 18 and a resident of Santa Clara County. At all relevant times alleged herein, Maria Argentina Garvin had only limited understanding of the English language, and all communications by and to Maria Argentina Garvin alleged herein occurred in the Spanish language, unless specifically alleged otherwise.

8. Plaintiff Jesus Arreola is the husband of Antonia Arreola. He is a Hispanic man over the age of 18 who traces his national origin to Mexico. At all relevant times alleged herein, Jesus

Arreola had only limited understanding of the English language, and all communications by and to Jesus Arreola alleged herein occurred in the Spanish language, unless specifically alleged otherwise.

9.     Plaintiff Antonia Arreola is a married Hispanic woman who traces her national origin to Mexico.  At all relevant times alleged herein, Antonia Arreola was over the age of 18 and a resident of Santa Clara County and spoke only Spanish and all communications by and to Antonia Arreola alleged herein occurred in the Spanish language, unless specifically alleged otherwise.

10.     Plaintiff Rafael Maldonado Bravo is a Hispanic man who traces his national origin to Mexico.  At all relevant times alleged herein, Rafael Maldonado Bravo was over the age of 18 and a resident of Santa Clara County.  At all relevant times alleged herein, Plaintiff Rafael Maldonado Bravo spoke minimal English, and was not proficient in reading or writing in the English language.  Accordingly, all communications with Rafael Maldonado Bravo alleged herein occurred in the Spanish language, unless specifically alleged otherwise.

11.     Plaintiff Tomas Hernandez is a married Hispanic man who traces his national origin to Mexico.  At all relevant times alleged herein, Tomas Hernandez was over the age of 18 and a resident of Santa Clara County.  At all relevant times alleged herein, Tomas Hernandez spoke limited English, and was not proficient in reading or writing in the English language.  Accordingly, all communications involving Tomas Hernandez alleged herein occurred in the Spanish language, unless specifically alleged otherwise.

12.     Plaintiff Martha Hernandez is a Hispanic woman who is married to Tomas Hernandez and who traces her national origin to Mexico.  At all relevant times alleged herein, Martha Hernandez was over the age of 18 and a resident of Santa Clara County.  At all relevant times alleged herein, Plaintiff Martha Hernandez spoke minimal, if any, English, and did not read or write in the English language.  Accordingly, all communications involving Martha Hernandez alleged herein occurred in the Spanish language, unless specifically alleged otherwise.

13.     Plaintiff Juan Ramirez is a Hispanic man who traces his national origin to Mexico.  At all relevant times alleged herein, Juan Ramirez was over the age of 18 and a resident of Santa Clara County.  At all relevant times alleged herein, Plaintiff Juan Ramirez spoke minimal, if any, English,

Case: 09-05252     Doc# 1     Filed: 09/24/09     Entered: 09/24/09 14:28:32     Page 3 of 40
SV 346,441,960v1

1  and did not read or write in the English language.  Accordingly, all communications involving Juan
2  Ramirez alleged herein occurred in the Spanish language, unless specifically alleged otherwise.

3          14.     Plaintiff Maria C. Ramirez is the wife of Juan Ramirez.  At all relevant times alleged
4  herein, Maria Ramirez was over the age of 18 and a resident of Santa Clara County.  At all relevant
5  times alleged herein, Plaintiff Maria Ramirez spoke minimal, if any, English, and did not read or
6  write in the English language.  Accordingly, all communications involving Maria Ramirez alleged
7  herein occurred in the Spanish language, unless specifically alleged otherwise.

8          15.     Plaintiff Eugenio Ramos is a married Hispanic man who traces his national origin to
9  Mexico.  At all relevant times alleged herein, Eugenio Ramos was over the age of 18 and a resident
10  of Santa Clara County.  At all relevant times alleged herein, Eugenio Ramos spoke minimal English,
11  and was not proficient in reading or writing in the English language.  Accordingly, all
12  communications involving Eugenio Ramos alleged herein occurred in the Spanish language, unless
13  specifically alleged otherwise.

14          16.     Plaintiff Columba Ramos is a Hispanic woman who is married to Eugenio Ramos and
15  who traces her national origin to Mexico.  At all relevant times alleged herein, Columba Ramos was
16  over the age of 18 and a resident of Santa Clara County.  At all relevant times alleged herein, Plaintiff
17  Columba Ramos spoke minimal, if any, English, and did not read or write in the English language.
18  Accordingly, all communications involving Columba Ramos alleged herein occurred in the Spanish
19  language, unless specifically alleged otherwise.

20          17.     Plaintiff Prospero Torralba is a married Hispanic man who traces his national origin to
21  Mexico.  At all relevant times alleged herein, Prospero Torralba was over the age of 18 and a resident
22  of Santa Clara County.  At all relevant times alleged herein, Plaintiff Prospero Torralba spoke limited
23  English, and did not competently read or write in the English language.  Accordingly, all
24  communications with Prospero Torralba alleged herein occurred in the Spanish language, unless
25  specifically alleged otherwise.

26          18.     Plaintiff Cirila Torralba is the wife of Plaintiff Prospero Torralba.  She is a Hispanic
27  woman, and traces her national origin to Mexico.  At all relevant times alleged herein, Cirila Torralba
28  was over the age of 18 and a resident of Santa Clara County.  At all relevant times alleged herein,

SV 346,441,960v1

Plaintiff Cirila Torralba did not speak, read, or write English. Accordingly, all communications with Cirila Torralba alleged herein occurred in the Spanish language, unless specifically alleged otherwise.

19. Plaintiff Raul Torres is a Hispanic man who traces his national origin to Mexico. At all relevant times alleged herein, Raul Gonzalez was over the age of 18 and a resident of Santa Clara County. At all relevant times alleged herein, Raul Gonzalez had only limited understanding of the English language. Accordingly, all communications by and to Raul Gonzalez alleged herein occurred in the Spanish language, unless specifically alleged otherwise.

20. Plaintiff Raul Gonzalez is a Hispanic man who traces his national origin to Mexico. At all relevant times alleged herein, Raul Gonzalez was over the age of 18 and a resident of Santa Clara County. At all relevant times alleged herein, Raul Gonzalez had only limited understanding of the English language. Accordingly, all communications by and to Raul Gonzalez alleged herein occurred in the Spanish language, unless specifically alleged otherwise.

21. Plaintiffs are informed and believe, and on that basis, allege that Defendant Tran is a California licensed real estate salesperson, operating under license number 01020843, the owner of Absolute Investment Group, dba Palacio Mortgage ("Absolute"), and employee of Tara Home Financial Services, Inc ("Tara").

22. Absolute is a licensed California real estate broker, operating under license number 01481907, which originates loans and represents clients in connection with the purchase and sale of real property. Its designated place of business pursuant to the California Secretary of State's records was 705 Capitol Expressway, San Jose, California, the same address as Defendant Absolute Investment Group, Inc., doing business as Palacio Mortgage ("Palacio").

23. Plaintiffs are informed and believe that, at all relevant times mentioned in this Complaint, Tara was and is a currently suspended California corporation, which regularly conducted business activity with Santa Clara County residents. Plaintiffs are informed and believe that Tara's business activities included the brokerage or residential real estate mortgage loans and representation of parties in residential real estate transactions. Tara is named as a defendant in the Federal Court Action.

Case: 09-05252   Doc# 1   Filed: 09/24/09   Entered: 09/24/09 14:28:32   Page 5 of 40
SV 346,441,960v1

24. Plaintiffs are informed and believe that, at all relevant times mentioned in this Complaint, Absolute, and a California corporation doing business as Palacio was and is a California corporation that regularly conducted business activity with Santa Clara County residents. Plaintiffs are informed and believe that Absolute's business activity included the brokerage or residential real estate mortgage loans and representation of parties in residential real estate transactions. Palacio and Absolute are also named as defendants in the Federal Court Action.

25. Pursuant to the California Secretary of State's Office, Defendant Linda Tran is the designated Agent for Service of Process for Absolute, and pursuant to the California Department of Real Estate's records, Raya Ghajar is an affiliated licensed broker for Absolute.

26. Plaintiffs are informed and believe and thereon allege that at all times herein mentioned, Defendant was acting in concert with the other defendants in the Federal Court Action, namely, Absolute, Tara, Raya Ghajar, Pablo Curiel, Pablo Curiel dba Downpayment Assistance ("Curiel"), Century 21 Golden Hills ("Golden Hills"), Norma Valdovinos ("Valdovinos"), Jesus Chavez ("Chavez"), Paul Curiel, and Paul Curiel Insurance Company.

27. Defendant Tran was the principal, agent, servant and/or employee or employer, and/or joint venturer of each of the other defendants in the Federal Court Action, and in doing the things herein mentioned, the other defendants were acting within the course and scope of such agency and/or employment and/or joint venturer, with the knowledge and permission of the others, or the alleged acts, omissions and other conduct of the defendant were subsequently ratified or adopted by the other defendants.

28. At all times herein mentioned, Defendant was acting within the course and scope of her real estate salesperson license.

29. All Plaintiffs conducted negotiation for the transactions alleged herein in Spanish, unless otherwise noted. No Plaintiff received any loan documents in Spanish.

//

//

//

COMPLAINT OBJECTING TO DISCHARGE AND DISCHARGEABILITY OF DEBT
BANKRUPTCY NO. 09-54184

Case: 09-05252    Doc# 1    Filed: 09/24/09    Entered: 09/24/09 14:28:32    Page 6 of 40

SV 346,441,960v1

## II. FACTUAL ALLEGATIONS

### Plaintiff Maria Argentina Garvin

30.     Maria Argentina Garvin ("Garvin") currently resides at 817 Pentz Way in San Jose CA (hereinafter "Pentz Way Property") with her daughter Roxanna Navarez, and son-in-law, Luis Navarez.

31.     In or about the spring of 2005, Garvin purchased a home with the assistance of Norma Valdovinos and Linda Tran.

32.     A friend of Garvin's daughter referred them to Valdovinos.  Shortly thereafter, Roxanna and Luis Navarez, along with Garvin, met with Valdovinos at her office.  Valdovinos checked the Navarez's credit but they did not have good credit or sufficient credit history.  Therefore, Valdovinos suggested that they put the loans and the house would be in Garvin's name only because her credit was better.

33.     Garvin and her family earned approximately $5,200 per month.  Garvin told Valdovinos exactly how much money she made every month, and Valdovinos told her that would be no problem.  Garvin also told Valdovinos that she and her family were looking for a two-bedroom home and could afford to pay no more than $2200 per month on a mortgage.  Valdovinos again responded that would be "no problem," and agreed to help them purchase a home; she also said there were many houses on the market that Garvin and her family could afford.

34.     Valdovinos made these statements, knowing they were false, to induce Garvin to purchase a home.

35.     Garvin reasonably relied on Valdovinos's statements in continuing with the transaction.

36.     Valdovinos then referred Garvin to defendant Tran for assistance with financing.  At the time, Tran was employed by Tara.  Valdovinos explained that she and Tran often worked together as a team and had been working together for years.

37.     One week later, Garvin, Mr. and Mrs. Navarez, and Valdovinos, met with Tran at her Tara office, with the assistance of an interpreter from Tran's office.

38.     At this meeting, Tran did some calculations and quoted Garvin a very high monthly mortgage payment.  Garvin promptly responded that her family could not afford such a high payment.  Tran responded that was fine because she had other loan programs that she could offer them, and promised she would find them "a low rate."

39.     A few days later, Tran called Garvin and told her that they had a "new plan," with monthly mortgage payments of $2700 per month.  Although this amount was higher than what Garvin and her family had originally planned, they agreed that they could make this payment between them.  No other information was provided to Garvin about the loans

40.     Tran's statement about the monthly payment was knowingly false and misleading.  Garvin reasonably relied upon the statement in attempting to purchase the property.

41.     In several conversations with Valdovinos, Garvin stated that before signing anything, she wanted to go over the loan documents with Valdovinos first, because she wanted someone to explain the paperwork as she felt that her understanding of English was not sufficient.  Valdovinos agreed to do so.

42.     On, or about May 31, 2005, Valdovinos called Garvin and said that her assistant Claudia Valdovinos, Norma Valdovinos's daughter, was going to pick her up to take her to Morgan Hill to sign the loan papers.  Garvin asked Valdovinos why Claudia was going to take her to sign documents when she had not seen any documents ahead of time, as she had previously requested on several occasions.  Valdovinos responded that she would see the documents when Claudia came to pick her up, and reassured her that she (Valdovinos) would also be present.  Based on Valdovinos's assurances, Garvin agreed to proceed.

43.     At all relevant times in this Complaint, Claudia was acting as an agent for Tara, Absolute, defendant Tran, Ghajar, and Valdovinos.

44.     That same day, on or about May 31, 2005, Claudia came to Garvin's apartment to take her to the title company to sign the final loan documents.

45.     In the car on the way to the title company, Claudia told Garvin not to tell "them" that she did not have "this money."  Garvin was confused and did not understand to what Claudia was referring.  When she asked Claudia to explain it to her, Claudia said that she did not know the details.

Case: 09-05252    Doc# 1    Filed: 09/24/09    Entered: 09/24/09 14:28:32    Page 8 of 40

46.     When Garvin and Claudia arrived, they met with a male employee, who presented Garvin with a stack of transactional documents written in English.  Contrary to Valdovinos's assurances, she did not come with Claudia and was not present when Garvin signed the loan documents.

47.     None of these documents had been presented to or explained to Garvin at any time beforehand, and no one explained any of the documents to her at closing.  Garvin was merely instructed where to sign.

48.     As they were sitting at the table, Claudia again told Garvin, "If they ask you about the down payment you don't say nothing [sic]."  When Garvin asked why, Claudia responded, "Just don't say nothing [sic] about this money."  Garvin still did not realize what Claudia was referring to, and was only aware of the $5000 they put down on the house as a deposit

49.     At the time that she signed the loan documents, Garvin understood that she was getting two loans: one from Washington Mutual Bank, and the other from National City Bank.  She believed that the monthly payments would be $2,700 per month.

50.     Approximately two days later, on or about June 2, 2005, Claudia called Garvin again and told her to come into defendant Tran's office to sign the documents for "the other loan."

51.     Garvin was very surprised by Claudia's phone call because had never discussed getting a third loan with Defendant Tran.  She asked Claudia why she had to sign more loan documents when she had already signed them two days earlier.  Claudia responded that was "the way it worked," and told Garvin that if she did not sign these new loan documents, she could incur a penalty.  Thus, Garvin proceeded to Tran's office, but told Claudia that she was not going to sign any documents until she had talked to Tran.

52.     When Garvin arrived at Tran's office, she was every upset and asked Tran why she had to sign more loan documents.  Using her assistant, Claudia, to interpret, Tran told her that there was no other way for her to purchase the home, because they had needed an additional $96,000 to put towards the home.  Tran told Garvin that they could try another bank and then started calculating numbers.  However, the alternative plan involved would have increased her monthly payment to $4,000 per month- far more than what Garvin and her family could afford.

Case: 09-05252     Doc# 1     Filed: 09/24/09     Entered: 09/24/09 14:28:32     Page 9 of 40
SV 346,441,960v1

53.     Garvin later found out that the HUD-1 for the first two loans fraudulently indicated that she was making a $96,000 down payment, which in fact were funds from a third loan that Tran and Valdovinos had arranged with defendant Pablo Curiel without Garvin's knowledge or consent.

54.     Garvin reviewed the straight note from Pablo Curiel that Tran had given to her to sign, and noticed that the loan amount was for $121,500.  Garvin asked Tran why the loan was for $121,500 and not $96,000, and Tran responded that the additional amount represented 2 years of pre-paid interest.

55.     Unlike the stack of transactional documents that she had signed days before, Tran presented Garvin with a single document- a "Straight Note" of $121,500 payable to Pablo Curiel.

56.     Absolutely no disclosures were provided to Garvin in connection with the Pablo Curiel loan, including any disclosures mandated under TILA, RESPA, or California law.

57.     Since the time of the transaction, Garvin learned that defendant Tran falsified or caused to be falsified her loan application, which contained many false or misleading misrepresentations concerning, inter alia, Garvin's assets, income and employment history, including the following:

a.      That Garvin's monthly income was $10,990;

b.      That Garvin had $31,000 in an account with Bank of America;

c.      That Garvin had $55,000 in an another account with Bank of America

d.      That Garvin's total liquid assets were $91,000;

e.      That Garvin had a net worth of $90,434; and

f.      That Garvin provided this information through a phone interview with "Jimmy Vu," an individual with whom Garvin has never spoken.

58.     Defendants also caused the final HUD-1 to be falsified by fraudulently indicating thereon that Garvin had put down a $96,000 down payment in addition to the $5,000 earnest money deposit that her son-in-law paid to Tran.

59.     Garvin's loans were as follows:

a.      A first loan from Washington Mutual Bank for $518,400.  This loan has an adjustable interest rate that is currently 7.9% and the monthly payment amount is $1,612.  This

SV 346,441,960v1

amount reflects the minimum payment, which does not cover principal or the full interest, therefore causing the interest to compound (also known as negative amortization).This loan also carries a three-year pre-payment penalty.

     b.    Garvin's second loan is an Equity Line of Credit from National City Bank $32,400. This loan began with a fixed interest rate of 8.75% and the monthly payments are $235.

     c.    Garvin's third loan was provided Pablo Curiel, at 10% interest, with interest only payments of $1,012.50 per month and a balloon payment for the full $121,000 due at the end of two years (June 2007).

60.    Garvin and her family struggle to meet their monthly mortgage obligations and are in danger of losing their home to foreclosure.

61.    Garvin health has suffered because of the stress caused by struggling for two years to pay their mortgage, and the family relations have become strained.

**Plaintiffs Antonia Arreola and Jesus Arreola**

62.    In 2004, Plaintiffs Jesus and Antonia Arreola ("the Arreolas") purchased the home at 18355 Del Monte Avenue in Morgan Hill, CA (hereinafter "Del Monte property") for $650,000 with the assistance of Valdovinos as their real estate agent, and Defendant Tran as their agent. At the time, Mr. and Mrs. Arreola owned a furniture store by the name of "Muebleria Plaza Del Sol."

63.    In or about August 2006, the Arreolas contacted Defendant Tran to see if they could refinance and lower their monthly payments. The Arreolas trusted Tran because they had worked with her before.

64.    Through her Spanish-speaking assistant "Angelica," Defendant Tran told the Arreolas to meet with her at her office and stated that she had some options for them that would achieve their goal of lowering their payments.

65.    About three weeks later, Mrs. Arreola met with Tran at her office, and Tran (with the interpretation assistance of "Angelica") presented her with the following plan: A first loan from Countrywide for $688,000, with a 2% interest rate and a monthly mortgage payment of $2,083, a second loan with National City Bank in the amount of $85,910, a fixed 8.125% interest rate and monthly mortgage payment of $638, and a third "private' loan in the amount of $46,000, at 10%

Case: 09-05252   Doc# 1   Filed: 09/24/09   Entered: 09/24/09 14:28:32   Page 11 of 40
SV 346,441,960v1

interest and monthly payments of $470. Thus, the Arreola's monthly mortgage payment would decrease from $4,800 to $3,191. Tran did not explain or disclose any other information about the three loans to Ms. Arreola.

66.     Despite the fact that on June 2, 2005 the Del Monte property appraised for $880,000, Tran told Mrs. Arreola that there was not enough equity in their home to refinance with only the first two lenders, so they needed the third private loan in order to achieve their goal of lowering their monthly mortgage obligation. Tran also stated that she could refinance the loans again in six months at no cost. Mrs. Arreola questioned Tran as to how that would be possible since the property had no equity in it, and Tran told her that it was okay because in six months the house would have sufficient equity to refinance.

67.     Tran and her agents made these knowingly false statements to Ms. Arreola to induce her to refinance with them.

68.     Reasonably relying on the statements of Tran and her agents, Ms. Arreola agreed to proceed with the transaction.

69.     Approximately three days later, Angelica called Mrs. Arreola to notify her that the final loan documents were ready for her to sign. Angelica asked Mrs. Arreola whether she wanted to sign the documents at the title company or at Tran's office. Mrs. Arreola responded that she wanted to come in to the office because she had some questions for Tran.

70.     On June 23, 2006, Mrs. Arreola went to Palacio to sign the final loan documents. Although Tran was in the office, she was unavailable to be present during Mrs. Arreola's signing of the loan docs.

71.     Mrs. Arreola was then shown to a room to sign the loan documents. Mrs. Arreola believes that a notary was present. While Mrs. Arreola waited in the room, "Angelica" would come in and bring her a stack of all English transactional documents to sign and then leave the room. Ms. Arreola asked Angelica how high the payments on the loan could get, but Angelica could not answer any questions about the loan and responded that she did not know.

72.     The entire signing event took no more than 45 minutes.

Case: 09-05252    Doc# 1    Filed: 09/24/09    Entered: 09/24/09 14:28:32    Page 12 of 40

SV 346,441,960v1

73.     No disclosures were provided to Mrs. Arreola in connection with the third loan from Pablo Curiel, including any disclosure required under TILA, RESPA, or applicable California law.

74.     Even though this was a refinance transaction, Mrs. Arreola did not receive or sign any Three-day Right to Cancel notice as mandated by TILA for the third loan from Pablo Curiel.

75.     About one month after signing the loan documents, Mr. and Mrs. Arreola received a statement form Pablo Curiel in the mail and learned that contrary to Tran's representation that the loan they had received from Pablo Curiel would be for $46,000, the loan amount was actually for $56,250.

76.     Several months after signing the loan documents, Mr. and Mrs. Arreola learned that their loans documents reflected that they received more than $84,000 in cash out in the refinance.  In fact, Mr. and Mrs. Arreola received no cash from the refinance.

77.     About one month after signing the loan documents, Mr. and Mrs. Arreola learned that Tran failed to disclose that the 2% rate on the Countrywide loan she had originally quoted Mrs. Arreola was an introductory rate that ended after one month.

78.     Since the time of the transaction, Mr. and Mrs. Arreola learned that defendant Tran falsified or caused to be falsified Mrs. Arreola's loan application, which contained many false and misleading misrepresentations concerning, inter alia, Mrs. Arreola's assets, income and employment history, including the following:

        a.     That Mrs. Arreola's monthly income was $17,500;

        b.     That Mrs. Arreola owned liquid assets valued at $860,000;

        c.     That Mrs. Arreola had a net worth of $172,000;

        d.     That Mrs. Arreola had no credit card debt, and monthly debt obligation was limited to $2,709 for the mortgage payment.

79.     The Arreolas first loan and adjustable rate mortgage with Countrywide in the amount of $688,000, with an annual percentage rate of 7.9%, and monthly payment of $2,083.  This loan payment represented the minimum payment, which does not include payments on the principal or full interest, causing the interest to compound.  The cap on the principal was 115% of the original principal amount.

- 13 -

Case: 09-05252     Doc# 1     Filed: 09/24/09     Entered: 09/24/09 14:28:32     Page 13 of 40

SV 346,441,960v1

80.     The Arreolas second loan was with National City Bank for $85,910 at a fixed rate of 8.125% and a balloon payment for $66,884 due in 15 years on June 22, 2021.

81.     The Arreolas had a third loan with Pablo Curiel for $56,250, at 10% interest, interest only payments for $ 468 per month and a balloon payment for $56,250 due June 2008.

82.     The Arreolas have since lost their home to foreclosure.

**Plaintiff Rafael Maldonado Bravo**

83.     Plaintiff Bravo works as a driver and has an income of approximately $3,000 a month. His credit score at the time of purchase was approximately 770 - 790.  At the time, Bravo owned a condominium.

84.     Bravo saw an advertisement for the real estate agent services of Normal Valdovinos posted in the magazine El Aquila.  The advertisement stated that Valdovinos could assist with the purchase of property with no money down and no work verification.

85.     Bravo called Valdovinos, who requested that he meet with her in person.

86.     When Bravo met with Valdovinos at her office in approximately March 2006, he informed her that he was interested in purchasing a duplex located at 789-791 Blossom Hill Road, San Jose, CA 95123, which he had seen advertised.

87.     Valdovinos explained that he could not see the property unless he paid a deposit of $5,000 and made an offer to purchase the property.

88.     Valdovinos knew this statement was false and purposefully made it to induce Bravo to make a deposit and a binding offer that he could not afford without any information.

89.     Bravo reasonably relied upon Valdovinos's statement and her expertise in the field in making a deposit and offer on a property he had not been shown.

90.     The duplex was listed at $789,000 but Valdovinos told Bravo to offer $799,000 to avoid closing costs.  Valdovinos informed Bravo that the monthly payments for the property would be between $3,000 and $4,000 and that he could afford that level of payment because he would be able to get rental income.

91.     Valdovinos' statement was knowingly false, and Bravo reasonably relied upon it in making a deposit and offer on the home.

- 14 -

Case: 09-05252    Doc# 1    Filed: 09/24/09    Entered: 09/24/09 14:28:32    Page 14 of 40

92.     With monthly rent payments from future tenants and funds from a $75,000 home equity line of credit on his condominium to pay any difference, Bravo believed he could afford to purchase the duplex based on Valdovinos' representations.

93.     Bravo made an offer on the property for $799,000 that was accepted.  Since Valdovinos informed Bravo that he could not look at the property prior to making a $5,000 deposit and making an offer to purchase the property, Bravo relied on the representations of Valdovinos and her colleague Jesus Chavez regarding the condition of the property.  He was informed and believed that the property was in very good condition and was being offered at a competitive price.

94.     When Bravo visited the property for the first time, he discovered it was in very bad condition.  Upon this discovery, Bravo informed Valdovinos of his concern that the property was represented to be in better condition than it was.

95.     Valdovinos informed Bravo that if he did not go through with the deal, he would lose his $5,000 deposit.

96.     This statement was knowingly false, as Bravo could have withdrawn without losing his deposit based on inspection contingencies.

97.     Bravo reasonably relied upon the statements of Valdovinos when he decided to go through with the purchase of the property.

98.     Shortly thereafter, Valdovinos called Bravo and informed him that he would need to meet with Chavez to sign some papers regarding the purchase of the property.  With Chavez, Bravo signed several disclosure documents relating to the property inspection and registered sex offenders in the area.  Bravo also paid for property insurance for one year through Farmer's Insurance and agent Paul Curiel.

99.     When Bravo asked any questions, Chavez said, "Everything is OK.  You already said yes."  Bravo reasonably believed that he had to continue with the transaction.

100.     Approximately three days later, Bravo was told to meet with Linda Tran in the office s of Absolute Investments, whom Valdovinos had said would handle his loan.  Bravo met with Tran to sign the loan papers.

101.     Tran never explained the loan documents to Bravo.

COMPLAINT OBJECTING TO DISCHARGE AND DISCHARGEABILITY OF DEBT

Case: 09-05252    Doc# 1    Filed: 09/24/09    Entered: 09/24/09 14:28:32    Page 15 of 40

SV 346,441,960v1

102. Defendant Tran knowingly fabricated Bravo's income and assets in his loan applications. The falsified applications were signed and ratified by Ghajar.

103. Defendant Tran purposefully withheld information from Bravo regarding the loan to induce him to continue with a loan he could not afford.

104. During the meeting with Tran was present to quickly review the loan documents with Bravo. At times, a woman from Tran's office, Angelica, was present to assist with Bravo with signing the papers. Tran and the notary informed Bravo not to put dates on documents. Tran left the room while Bravo signed the loan documents in front of the notary.

105. At the time that Bravo signed the loan papers, he believed that he was obtaining two loans for the purchase of the property.

106. Approximately five days later, Bravo was contacted by Angelica, from Absolute Investments. She told Bravo that he had to come to the office to sign some more papers. Bravo believed that the additional papers he needed to sign were for the property insurance.

107. On the very same day, Bravo met with Tran at her office. Tran informed Bravo that the purchase of his property required a third loan for which Bravo would need to sign the papers. Bravo was informed that the third loan was a private loan for the down payment.

108. When Bravo asked why he was not told about the private loan previously, Tran responded that if Bravo did not sign the loan papers, he would lose the property and his $5,000.00 deposit.

109. Tran further informed Bravo that he must pay $812.00 a month to Pablo Curiel and that he would never receive a monthly statement. Tran informed Bravo that she would refinance his property when it had gained equity to pay off the Pablo Curiel loan, before the balloon payment matured.

110. He did not receive any documents relating to the third Curiel loan except the Straight Note.

111. Bravo's first loan was for $585,000 from Washington Mutual. The loan had a "teaser" rate of 1.35%, which was only in effect until June 1, 2006 (for approximately two months). The interest rate is variable, calculated by adding 3.025 points to an index, up to a maximum of 10.05%.

Case: 09-05252   Doc# 1   Filed: 09/24/09   Entered: 09/24/09 14:28:32   Page 16 of 40

SV 346,441,960v1

It is a negative amortization loan, which means that if Bravo makes the minimum payments, the principal will continue to grow. When the principal reaches the 110% of the loan or five years has passed, Bravo will no longer be able to make the minimum payments. He will be required to pay the full portion of principal and interest. Although Bravo's monthly payments will change once a year, his interest rate changes monthly.

112. Bravo's second loan was for $117,000 through Washington Mutual. The interest rate is variable, calculated by adding 0.6% to an index and starting at 8.1%.

113. Bravo's third loan was for $97,500 from Pablo Curiel. Approximately $20,000 of that loan was paid to Defendants as "upfront interest." The loan is interest only for two years, which is due in monthly installments of $812.50, after which time a balloon payment of the entire loan amount will be due.

114. Upon receiving his loan statements for the first two loans, Bravo discovered that he paid $25,000.00 - $27,000.00 above the purchase price. Bravo immediately called Valdovinos, who told him that the extra money was paid to Pablo Curiel as upfront interest.

115. Approximately two months after purchasing the duplex located at 789-891 Blossom Hill Road, San Jose, California, 95123, Bravo received a telephone call from Valdovinos informing him that a duplex was for sale and was being offered at a good price. Valdovinos told Bravo that he could purchase the property for a very cheap price. The property was located at 943/945 Desert Isla, San Jose, California.

116. Valdovinos told Bravo that he would have enough money to purchase the property because he would be able to use the rent to make the monthly payments and would only have to pay about $200.00 - $400.00 more each month to cover the difference.

117. Valdovinos had knowledge that Bravo had previously taken an equity line of credit and deposited the funds into his account. On that basis, she encouraged Bravo to purchase the property.

118. When Bravo expressed his concerns about being able to purchase the property since he had just purchased another piece of property a couple of months before, Valdovinos explained to him that he would be approved to purchase the home because he was buying the property with his credit

Case: 09-05252    Doc# 1    Filed: 09/24/09    Entered: 09/24/09 14:28:32    Page 17 of 40

(and not the funds he had in his account). Valdovinos represented that other people with similar credit were buying about 2-3 properties and that Bravo should do the same.

119. Valdovinos told Bravo that if he wanted to see inside the property, he would have to pay her a $7,000.00 deposit. When Bravo informed Valdovinos that he did not have $7,000.00, Valdovinos asked Bravo how much he could pay. Bravo explained to Valdovinos that he could probably pay about $2,000.00. Subsequently, Valdovinos told Bravo that she would accept his $2,000.00 deposit and would cover him for $5,000.00 since he purchased the Blossom Hill property through her.

120. Valdovinos told Bravo that the monthly payments would be approximately $3,180.

121. Valdovinos knowingly made false statements to Bravo to induce him to purchase another property that he would not be able to afford. Bravo reasonably relied upon these statements in continuing with this transaction.

122. Valdovinos instructed Bravo to meet with Tran, who informed him that his monthly payments would be $3,300.00.

123. Tran also told Bravo that Valdovinos had made an offer on the property for $810,000.00. Since Bravo was informed previously that the list price for the property was $799,000.00 he asked Tran why she offered more and that he wanted to speak with Valdovinos.

124. When Bravo called Valdovinos to find out whey she made an offer greater than the list price, she explained that it would cost $25,000 extra over the list price for the paper work but that if Bravo paid $810,000.00 the seller would cover the difference.

125. Approximately 3-4 days later, Tran called Bravo to inform him that he would need to sign the loan papers. Tran informed Bravo that the monthly payment had changed a little and would not be $3,300.00 a month as they previously told him. Tran explained that the monthly payment for the first loan would be $3,500 and the payment for the second loan would be $1,568. Tran also explained that the loans would be interest only and not option-arm as she had previously told Bravo.

126. Subsequently, Bravo met with Valdovinos to ask her why he was told that his monthly payments were going to be $3,300.00 when they are in fact $5068.00. Valdovinos told Bravo to trust that Tran would lower his monthly payments after two months. She also told Bravo that if he did not

- 18 -

Case: 09-05252    Doc# 1    Filed: 09/24/09    Entered: 09/24/09 14:28:32    Page 18 of 40

complete the purchase, he would lose his $2,000.00 deposit plus would have to pay her for the $5,000.00 that she covered.

127.     To memorialize this deal, Tran drafted a written letter that she signed explaining that Bravo was only obligated to make payments in the total amount of $5,068 for two months.  The letter indicated that following two months of payments, Bravo would return to Tran's office to refinance his loan, which would lower his monthly payments.

128.     These statements by Tran and Valdovinos were knowingly false and were intended to induce Bravo to purchase a property he could not afford and to refinance that property, all of which resulted in high fees for these Defendants.

129.     In reasonable reliance on the representations made by Tran and Valdovinos, Bravo went through with the purchase of the property.

130.     Tran and Valdovinos failed to abide by their agreement to lower the monthly payments for Bravo in two months.  .

131.     Bravo struggles to make his monthly payments on the properties, and is at risk of losing his properties to foreclosure.

**Plaintiffs Tomas and Martha Hernandez**

132.     In approximately October 2005, Tomas and Maria Hernandez contacted Valdovinos, who told the Hernandez Plaintiffs that she could help them to purchase a home.

133.     Mr. and Mrs. Hernandez went to the offices of Golden Hills, and Valdovinos checked their credit score and stated that they both had good credit.  She asked for their total income, which at that time was approximately $6,000 to $7,000 per month.

134.     The Hernandezes told Valdovinos that they could only afford a monthly payment of $2,300 to $2,400 per month.  Valdovinos responded that she would show them homes with that monthly payment.

135.     After showing the Hernandez Plaintiffs several homes in areas they did not like, Valdovinos called them in approximately November 2005.  She stated that she had found a house for $762,000 that they would like.

COMPLAINT OBJECTING TO DISCHARGE AND DISCHARGEABILITY OF DEBT
BANKRUPTCY NO. 09-54184
SV 346,441,960v1

Case: 09-05252   Doc# 1   Filed: 09/24/09   Entered: 09/24/09 14:28:32   Page 19 of 40

136. Ms. Hernandez told her the price was too high. Valdovinos stated on the telephone, "Don't worry. The loan agent can give you a low payment."

137. Valdovinos knew that the Hernandezes could not afford the house she was showing them on the loan terms that she and the other Defendants intended and that the loan payments would not be $2,500 or less.

138. The Hernandezes reasonably relied upon the statements of Valdovinos, who they trusted, to continue with the purchase of this home.

139. Valdovinos called back an hour later to tell the Hernandezes that she had gotten the seller to agree to lower the price to $750,000.

140. Several hours later, Tran called the Hernandezes and set up an appointment for that same day. They went to the offices of Absolute on Capitol Expressway, in San Jose.

141. Tran told the Hernandezes that she could get them low-interest loans to make the home affordable. Tran's statement was knowingly false and misleading. The Hernandez Plaintiffs reasonably relied upon Tran's statement in continuing with the transaction.

142. Tran's employee "Angelica" acted as an interpreter, and the negotiation of the loans occurred in Spanish. Tran instructed the Hernandezes to sign a large stack of documents, all of which were in English. Neither Tran nor Angelica explained what the documents said.

143. When Ms. Hernandez attempted to confirm that the payments would be approximately $2,500, Tran, through Angelica, told them for the first time that the monthly payments would actually total $4,664.

144. When the Hernandez Plaintiffs told Tran that they could not afford it, she promised them that she could refinance them into a different loan in April or May 2006. At that point, she promised that there would be one fixed loan payment for between $2,400 and $2,600, and wrote the figures down of paper for the Hernandezes. At that time, Tran knew that this information was false and that a refinance would cost the Hernandezes additional fees to Tran and loss of equity.

145. The Hernandezes reasonably relied upon Tran and Valdovinos's statements in continuing with the purchase transaction.

Case: 09-05252    Doc# 1    Filed: 09/24/09    Entered: 09/24/09 14:28:32    Page 40 of 40
SV 346,441,960v1

146.    Tran then told the Hernandezes to go to the title company to sign more documents. There, they signed another stack of documents, all of which were in English. A title company employee requested a check for $13,000.

147.    Ms. Hernandez told the employee that she only had $3,000. The employee told her that she would talk to Valdovinos. The employee told Ms. Hernandez that she could not back out now.

148.    The Hernandez Plaintiffs were barely able to make the payments of $4,664 for the first few months, but they did so with the understanding that their payments would be reduced in April or May 2006.

149.    In April 2006, Mr. Hernandez went to see Tran at the Absolute Investments office. Tran told Mr. Hernandez, using Angelica as an interpreter into Spanish, that she had already started the paperwork and it would be ready in one to two weeks.

150.    In the second half of April, Angelica called the Hernandez Plaintiffs and told them that Tran asked for their bank statements. At this point, the Hernandez Plaintiffs had less than $500 in their bank account.

151.    Neither Angelica nor Tran ever asked the Hernandez Plaintiffs for their current income, which had decreased. Nonetheless, Ms. Hernandez volunteered that information to Angelica.

152.    Approximately two days later, Angelica called Ms. Hernandez and told her to come and sign the documents. Ms. Hernandez said to Angelica that Tran promised her $2500 payment. Angelica said, "Everything that she promises comes true. She's helping a lot of people."

153.    The Hernandez Plaintiffs reasonably relied to their detriment on this statement, which was knowingly false.

154.    Approximately three days later, on May 2, 2006, the Hernandezes went to see Tran at the Absolute Investments office. They met with an employee named Heidi who asked them to sign a stack of documents, all of which were in English.

155.    Defendants knowingly fabricated the Hernandezes income and assets in their loan applications. This falsified application was ratified by Ghajar.

Case: 09-05252    Doc# 1    Filed: 09/24/09    Entered: 09/24/09 14:28:32    Page 41 of 40

156.     At some point during the signing, the Hernandez Plaintiffs saw a document that looked like their total payment would be $3600 per month.

157.     Ms. Hernandez told Heidi, "This isn't right.  This isn't what we agreed to."  Heidi could not explain it, so Ms. Hernandez asked to speak to Angelica or Tran.  Heidi told her that neither person was present, even though Ms. Hernandez could hear Tran's voice in another office.

158.     The Hernandez Plaintiffs thought that because they had already signed a number of the documents, they were stuck, so they continued signing as urged by Heidi.

159.     After the Hernandez Plaintiffs had signed all the documents for the loans, a notary showed up and Tran came into the room.

160.     When asked, Tran explained that the notary was from the private lender, Pablo Curiel.

161.     Defendant purposefully never told the Hernandezes that they would have three loans, nor that one of the loans was from a private individual.

162.     The Hernandez's first refinance loan was for $596,000 through Countrywide Home Loans.  It has a starting interest rate of 1.25%, but that rate was only effective one month.  After the first month, the interest rate is variable, calculated by adding 2.975 points to a LIBOR index.  The interest rate can increase to 9.95%.  The loan is a negative amortization, which means that the minimum monthly payments do not even cover interest.  If the borrower pays the minimum payments, the amount owed on the loan continues to increase.  When the principal reaches 115% of the borrowed amount or five years has passed the minimum payments increases dramatically to full principal plus interest.  The loan has a pre-payment penalty, which means that the borrower must pay six months of interest if the loan is refinanced or paid off during the first three years.

163.     from that first loan, Absolute was paid $17,880 as a yield spread premium from Countrywide.  The estimate of charges shown to the Hernandez Plaintiffs had the yield spread premium erased.

164.     Defendants knowingly failed to disclose the material terms of this loan to the Hernandezes.  They did not understand that the principal they owed on the house would continue to increase as they made payments.

Case: 09-05252     Doc# 1     Filed: 09/24/09     Entered: 09/24/09 14:28:32     Page 22 of 40

165. The Hernandez's second refinance loan was for $74,450 from National City Bank. The loan was a 15 year loan with a fixed rate of 7.75%. After 15 years, a balloon payment of approximately $57,000 would be due.

166. None of the Defendants ever explained the terms of this loan to the Hernandez Plaintiffs. The Hernandez Plaintiffs did not understand that they would have to pay a balloon payment after 15 years.

167. The Hernandez's third refinance loan was for $108,125 from Defendant Pablo Curiel. It was an interest-only loan at 10% for two years. After two years, a balloon payment of the entire loan ($108,125) was due.

168. In addition, only approximately $85,000 of the Curiel loan was credited to the refinance. The other approximately $23,000 was taken as an upfront fee by Defendants.

169. After signing, the Hernandez Plaintiffs received some unsigned documents associated with their first and second refinance loans. The only document they received relating to the third Curiel loan were payments stubs in the mail.

170. The Hernandez Plaintiffs never received any signed documents. The Hernandez Plaintiffs never received a final HUD-1 closing statement. The Hernandez Plaintiffs never received a right to cancel notice for the first or third loans with a date properly filled in. The Hernandez Plaintiffs never received any disclosures in Spanish, even though the loan was negotiated in Spanish.

171. Since the purchase and refinance of the home, the Hernandezes have struggled to meet their monthly obligations. They have fallen behind in their payments, and are at risk of losing their home.

Plaintiffs Juan and Maria Ramirez

172. From 2004 to early 2006, Juan Ramirez ("Ramirez"), his wife Maria, and their two small children had been renting an apartment at 1919 Fruitdale Avenue in San Jose, California. They paid $1,250 in rent per month. Ramirez attempted to buy a home, but it fell through at the last minute. Because Ramirez had given notice on the Fruitdale apartment, he and his family needed a

Case: 09-05252   Doc# 1   Filed: 09/24/09   Entered: 09/24/09 14:28:32   Page 42 of 40

SV 346,441,960v1

place to live.  They moved in with Ramirez's cousin, Prospero Torralba, in January or February of 2006.  Prospero Torralba is also a plaintiff in the Federal Court Action.

173.   In early April 2006, Ramirez was referred to Jesus Chavez at Golden Hills to purchase a home.  Ramirez contacted Chavez and made an appointment to speak with him that day.  Chavez met with Ramirez, discussed Ramirez's desire to purchase a home, and ran a credit check.  Ramirez had a good credit score, but his wife Maria had no credit history.  Therefore, Chavez recommended that they proceed to purchase the home in Juan's name only.

174.   During the meeting, Chavez called Tran and asked how much of a loan Ramirez could obtain.  Tran informed Chavez that Ramirez could obtain a loan for $650,000.  Chavez did not ask Ramirez about his income.

175.   Chavez then told Ramirez to make an appointment with Tran to discuss the loan. Ramirez made an appointment and went to see Tran about one week later.  During the meeting, Tran used an interpreter named "Angelica."

176.   Ramirez explained to Chavez that Ramirez wanted a fixed rate loan, not a variable rate loan.  Chavez said that would "not be a problem."

177.   Tran proposed a loan under which the payments would be $3,600 per month, including taxes.  However, Ramirez told Tran that the highest monthly payment he could afford to pay was $3,200.

178.   Tran then proposed a plan that would involve three loans.  The first loan would cost $1,250 per month with an interest rate of 6.5%; the second would cost $700 per month with an interest rate of 9.75%, and the third would cost $675 per month, for a total of $2,625 per month.  Tran said this loan package would be "perfect" for Ramirez and promised that she could refinance the third loan in six months.  Tran also said that Ramirez's home would appreciate $40,000 per year, so Ramirez would actually make money.

179.   Ramirez explained to Tran that he wanted a fixed rate loan, not a variable rate loan. Tran said that would be "no problem."

180.   Tran informed Ramirez that the third loan was a private loan, but did not disclose any of the terms of the third loan.

COMPLAINT OBJECTING TO DISCHARGE AND DISCHARGEABILITY OF DEBT

Case: 09-05252   Doc# 1   Filed: 09/24/09   Entered: 09/24/09 14:28:32   Page 44 of 40
BANKRUPTCY NO. 09-54184

SV 346,441,960v1

181. In late April, Ramirez and his put an offer in on the home at 2788 Cramer Circle, San Jose, California, 95111. One day later, Chavez asked Ramirez for $5,000 as a show of good faith interest in the house. Ramirez did not have $5,000, but gave Chavez a deposit of $3,500. Several days later, the offer was accepted.

182. Unknown to Ramirez, the loan application falsely stated the following:

a. That Ramirez works as a produce supervisor earning $4610 per month.

b. That Ramirez is a self-employed handyman earning $7990 per month.

c. That Ramirez owns a 2002 Chevrolet Tahoe.

d. That Ramirez would make a down payment from savings, including a Bank of America account with $28,214 in it and a Wells Fargo account containing $78,588. Ramirez does have accounts with Bank of America and Wells Fargo, but the balances were never in those amounts.

e. That Ramirez is the owner of a business.

183. One week after making the offer, Ramirez went to Chavez's office to pick up the inspection report for the house. At that time, he learned that the seller of the house was the brother-in-law of Chavez's wife, Norma Valdovinos.

184. Chavez's receptionist, Erica, called Ramirez in to sign the final papers on May 11, 2006. Ramirez signed the papers for the first two loans at Chavez's office, and then went to Tran's office to sign the loan documents for the third loan. Present at the first signing in Chavez's office were Juan Ramirez, the notary (Martha Hueso), Chavez, and Tran.

185. Ramirez was instructed to sign the English only loan documents, which he had never seen or reviewed beforehand. The entire meeting took approximately 45 minutes, and Ramirez was given only un-signed copies of the loan documents.

186. After signing the papers at Chavez's office for the first two loans, Ramirez immediately went to Tran's office to sign the papers for the third loan. Tran was busy at first, so another person from Tran's office assisted Ramirez. Tran joined the meeting at the very end.

187. When Ramirez reviewed the papers, he was troubled by the numbers because they did not seem to add up.

Case: 09-05252    Doc# 1    Filed: 09/24/09    Entered: 09/24/09 14:28:32    Page 45 of 40

188. Additionally, the private loan was supposed to be for approximately $66,000 at a rate of 10%. However, the loan documents reflected that the private loan was actually for a principal amount of $80,625. When Ramirez asked about this discrepancy, Tran explained that the difference was "insurance."

189. The Ramirezes lost their home to foreclosure on January 22, 2009.

**Plaintiffs Eugenio and Columba Ramos**

190. In early June 2006, the Ramoses were referred to Valdovinos through a classmate of Mrs. Ramos's who is Valdovinos sister-in-law. Mrs. Ramos called Valdovinos immediately after receiving the referral to discuss their desire to purchase a home. The Ramoses had been house hunting, but had not yet selected a house that they wanted to buy. Valdovinos told Mrs. Ramos to call her back when they had selected a home that they wanted to buy.

191. Two weeks later, Mrs. Ramos called back to say that they had selected a home they wanted to purchase. Valdovinos informed them that they would need to speak with Tran who would determine if they were qualified to purchase the home they wanted.

192. The first week in July 2006, the Ramoses met with Tran, who at this point was acting an employee of Palacio Mortgage, as the agent for their first loan. Tran showed the Ramoses different payment options for loans in the range of $750,000 - $900,000. Defendant Tran represented that payments on loans for homes in this price range were approximately $3,000.00 - $4,000.00 a month. During the meeting between Tran and the Ramoses, Claudia Valdovinos assisted with interpreting.

193. At this meeting, Tran checked Mrs. Ramos's credit only and told her that her credit was good, and that they should put in an offer on the home. Two days later, Tran called the Ramoses back to her office and told them that Mrs. Ramos did not have sufficient credit to purchase the home, and that Tran needed to check Mr. Ramos's credit. Tran told them that with their combined credit, they should be able to purchase the home.

194. The Ramoses had a combined income of approximately $8,000.00 - $9,000.00 a month. At the time, they had a savings account with approximately $2,000.00 - $5,000.00.

COMPLAINT OBJECTING TO DISCHARGE AND
DISCHARGEABILITY OF DEBT
BANKRUPTCY NO. 09-54184
SV 346,441,960v1

195.     After meeting with Valdovinos and Tran, the Ramoses found another home to buy. Mrs. Ramos found one home in an area that she liked that was listed for approximately $850,000.00 - $875,000.00.  After deciding to put an offer in at the list price, the Ramoses were later contacted by Valdovinos who informed them that the list price was actually $950,000.00.  Based on the representations made by Valdovinos and Tran, the Ramoses believed that the monthly payments to purchase this home would be between $3,000 - $4,000 a month.

196.     In approximately July 2006, the Ramoses put in an offer to purchase the home for the list price of $950,000.00, which was accepted.  The home is located at 1435 Redmond Avenue, San Jose, California 95120.

197.     The Ramoses purchased the home with a $5,000 deposit.

198.     Claudia called the Ramoses to meet with Tran at her office on or about August 23, 2006 to sign documents for the purchase of their home.  "Heidi" who speaks Spanish and who worked in Tran's office, was present to assist the Ramoses with signing their papers.  She informed the Ramoses that a better loan had been secured for the Ramoses that was fixed (not variable) at a rate of 8%.

199.     During the signing of the papers, the Ramoses noticed from the loan paper work that the total amount for the loan was for $970,000 and not $950,000.  When they asked Heidi about this, she told the Ramoses that they should not worry about the $20,000.00 difference.

200.     At the time of signing, the Ramoses believed that they were borrowing two principal and interest loans.  The monthly payments for each loan were approximately $2500.00 for the first loan, $770.00 for the second loan and $989.00 for the third loan.

201.     Alliance Bancorp is the plaintiff's first lien holder.  The loan with Alliance Bancorp is for $750,000 with an adjustable interest rate of 8.23%.  It is a negative amortizing loan with a 110% cap on the principal amount and a three year pre-payment penalty.  The loan carries a balloon payment of $484,028 due on maturity, September 1, 2036.  Minimum monthly payments on this loan are $1896.  The principal has now increased to $789,000.

Case: 09-05252     Doc# 1     Filed: 09/24/09     Entered: 09/24/09 14:28:32     Page 27 of 40
SV 346,441,960v1

202. National City Bank holds Plaintiff's second mortgage. The loan is for $104,950, at an 8.197% fixed rate with an $81,350 balloon payment after fifteen years. Tran lender did not provide TILA disclosures to Plaintiffs for their second loan.

203. The third loan is held by Pablo Curiel. The Ramoses were informed that the third loan through Pablo Curiel was a private loan.

204. The Ramoses do not have any signed copies of any loan documents and were only given unsigned copies at closing.

205. One month after signing the loan paperwork, the Ramoses received their first statement. They saw that the loan was in the name of Eugenio Ramos only. Tran had told the Ramoses that the loan would be taken out in the name of both Eugenio and Columba Ramos. The Ramoses called Tran to complain about the loan being in Eugenio's name only, and were told by Tran that it was a mistake that could be corrected.

206. Two months after signing the loan paperwork when the Ramoses received their second statement, they discovered that their loan payments would be increasing each month, which was contrary to what had been represented by Claudia, who had informed the Ramoses that their monthly payments would not increase for three years. Ms. Ramos telephoned Tran's office, and Heidi told her that Claudia should have explained the full terms of the loan.

207. In or about October 2006, the Ramoses were very upset that the terms of the loan were not what Tran, Claudia, and Valdovinos had represented, and met with Tran and Claudia to complain. At the meeting, Tran suggested that the Ramoses refinance their third loan with Pablo Curiel. At this point, the Ramoses did not trust Tran, and declined to refinance.

208. The loan application falsely states that the Ramoses have a combined income of $28,650.00.

**Plaintiffs Prospero and Cirila Torralba**

209. Plaintiff Torralba and his wife, Cirila Torralba, purchased a home at 4754 Lyric Lane, San Jose, California, 95111 for $595,000.

210. In late January 2006, Torralba contacted Valdovinos after seeing her advertise homes for $0 down and 100% financing. Chavez, not Norma Valdovinos, called in response to Torralba's

Case: 09-05252    Doc# 1    Filed: 09/24/09    Entered: 09/24/09 14:28:32    Page 40 of 40

message. Torralba told Chavez that he could not put any money down on a house, and that he could pay, at most, $2,500 per month.

211. In or about early February 2006, Torralba met with Chavez at Chavez's office. Chavez asked Torralba about his income and performed some calculations. Chavez then informed Torralba that he qualified for a $700,000 loan. Torralba once again emphasized to Chavez that he could not afford to pay more than $2,500 per month.

212. In mid-February 2006, Torralba authorized Chavez to offer $575,000 for the house. At Chavez's request, Torralba provided $3,000 as a show of good faith on the offer. After approximately one week, Torralba called Chavez to ask what happened. Chavez told Torralba that his offer would be accepted. Torralba did not authorize Chavez to offer any more than $575,000 on the house.

213. .Later, Torralba and Chavez went to Chavez's office to complete the loan application. Chavez asked Torralba to sign a blank piece of paper. Torralba was reluctant to do so, but Chavez insisted that it would make the process move along faster. Torralba ultimately did not sign the blank piece of paper.

214. Chavez told Torralba to make an appointment to see Tran, who would help Torralba get the home loans. Torralba made an appointment and went to Tran's office. Tran performed calculations, but her explanations confused Torralba. He emphasized to Tran that he simply wanted to pay no more than $2,500 per month.

215. On March 27, 2006, at the time Torralba signed the loan application, his income was approximately $3,000 per month. Torralba works in construction. His wife, Cirila, worked as a supervisor in a hotel at that time; her income was approximately $1,600 per month.

216. Torralba signed the loan papers on March 17, 2006, in Chavez's office. Torralba did not understand some of the documents, so he asked the interpreter, "Angelica," to explain some of the terms. Angelica responded that she "did not know" and advised Torralba to ask Tran or Chavez. No notary was present at the signing.

217. Torralba then signed more loan papers at Tran's office the same day. There was a notary present at Tran's office. Tran told Torralba that Torralba's monthly payments would be

SV 346,441,960v1

between $2,300 and $2,500.  Tran did not tell Torralba the amounts of the loans, nor the interest rates.  Tran did tell Torralba that he could refinance in about six months and eliminate one of the loans.

218.    The closing date on the house was March 24, 2006.

219.    Torralba was never informed, and did not know until approximately May 2006, that he had three loans.  In May 2006, Torralba received a loan note from Pablo Curiel with payment vouchers.  When Torralba contacted Curiel to ask about the loan, Curiel asked if Chavez had explained the third loan.  Torralba answered that no one had ever told Torralba that he was taking three loans.

220.    Torralba's first loan is with Washington Mutual for $446,250.  It is a forty-year, negative amortization loan with a 7.138% interest rate.  The interest rate can change monthly with a cap of 10.175%.  The loan carries a pre-payment penalty of 3% of the loan in the first year, 2% the second year, and 1% the first year.

221.    Torralba's second loan is an "Equity Plus Revolving Line of Credit" with Washington Mutual for $89,250.  The interest rate is 8.15% and is adjustable with a cap of 18%.

222.    Torralba's third loan is with Pablo Curiel for $74,375.  The loan has a 10% interest rate with a two-year balloon.  It is an interest-only loan.  The monthly payment is $619.79.

223.    Prospero and Cirila Torralba have been struggling to make their monthly payments and are at risk of losing their homes to foreclosures.

**Plaintiff Raul Torres**

224.    At the time that Raul Torres purchased his home using the services of Norma Valdovinos and defendant Linda Tran, he was a gardener and landscaper and had an income of approximately $3,300 a month.  Torres is married and his wife took care of an elderly woman, earning approximately $600-$700 per month.  Torres and his wife were previously renting an apartment in San Jose and paying $750 a month.

225.    Torres saw an advertisement for the real estate agent services of Valdovinos posted in the magazine El Avisador, which stated that Valdovinos could assist with the purchase of property with no money down and no work verification.

COMPLAINT OBJECTING TO DISCHARGE AND DISCHARGEABILITY OF DEBT
BANKRUPTCY NO. 09-54184

SV 346,441,960v1

226. Torres reasonably relied upon this advertisement, which was intentionally misleading in that it did not state that Defendants misrepresented borrowers' income and assets to be able to purchase these homes.

227. Torres went to visit Valdovinos and Linda Tran about purchasing a house. Torres told Valdovinos and Tran that he could afford to pay approximately $2,500 to $2,600 per month in mortgage payments. Tran told Torres that she could find him a loan with a fixed interest rate and monthly mortgage payments of $2,600 per month.

228. Valdovinos found Torres a home in late May/early June. Torres filled out loan documentation for a loan arranged through Tran. Torres gave notice that he would be vacating his apartment, as he was supposed to move into his new house in mid-June 2006. A few days later, Valdovinos told Torres that the previous owner changed his mind about selling the house. Torres and his wife were forced to move into another apartment while Valdovinos searched for another house for them.

229. In August 2006, Valdovinos found a house for Torres to purchase, located at 2623 Lombard Avenue, San Jose, California, 95116. Torres filled out loan documentation for a loan arranged through Tran.

230. The first loan was from Ownit Mortgage Solutions, Inc. for $512,000. The initial monthly payments on this loan were $3,859.84 per month. It was an adjustable interest rate loan with an initial interest rate of 8.875% and a balloon. This loan came with $15,564.72 in various finance charges. The second loan was also from Ownit Mortgage Solutions for $128,000. The monthly payments on this loan were initially $1,342.62. The loan had an adjustable interest rate with a starting rate of 12.5%.

231. When Torres received his first statement, he learned that his monthly mortgage payments totaled $5,000, approximately $2,500 more per month than what he told Valdovinos and Tran he was able to afford per month. Panicked, Torres called Valdovinos and Tran and told them he could not afford such high monthly payments. Tran told Torres not to worry, that in three months he could refinance and his payments would be $2,500 per month. Tran wrote Torres a personal check

Case: 09-05252    Doc# 1    Filed: 09/24/09    Entered: 09/24/09 14:28:32    Page 31 of 40

SV 346,441,960v1

for $2,000 to help him make his first month's loan payments. Tran told Torres that this check was from her personal account, and that Torres would pay it back when he refinanced in three months.

232. From September to November, Torres struggled to make a monthly loan payment that was approximately $2,500 more per month than what he was able to afford.

233. In November 2006, Tran and Valdovinos called Torres into her office to sign loan documents for a refinance. Tran told Torres that the refinance would lower his monthly payments to $2,800 per month, and that he would have a fixed interest rate.

234. Defendant Tran knowingly fabricated Torres's income and assets in his loan applications. Tran purposefully withheld information from Torres regarding the loan to induce him to continue with a loan he could not afford.

235. After signing documents for a first and second loan, Tran told Torres that he did not qualify for the entire amount of the refinance, and that he would need to sign a third loan through a private party named Pablo Curiel.

236. Torres questioned Tran about the third loan, and asked why a third loan was necessary since he had good credit. Tran said that Torres no longer had good credit, and therefore that the third loan was necessary to refinance. She also said that he must get the third loan because Torres had already signed the first two loan documents.

237. Tran never explained the true nature of the loan documents to Torres. Torres believed Tran when she told Torres that even with the third loan his loan payments would be $2,800 per month.

238. Torres never received any signed documents. He did not receive any documents relating to the third Curiel loan except the Straight Note.

239. Two weeks later a notary public showed up at the Torres house unannounced. She told Torres that the loan documents had been lost and he needed to sign them again, and that he should backdate the document to the date that he signed the original loan papers in Tran's office. After Torres signed the documents, the notary took Torres's copy of unsigned loan documents that Torres had in his possession. The documents that the notary took from Torres were the only copy he had of loan related documents.

Case: 09-05252   Doc# 1   Filed: 09/24/09   Entered: 09/24/09 14:28:32   Page 42 of 40

240.    In the middle of December, Torres received his first mortgage payment statement after the refinance transaction and realized that his monthly mortgage payment would be only $200 less per month than before the refinance.

241.    When he received his first mortgage payment statement, Torres learned for the first time the terms of the refinance.  Torres's first loan was through Alliance Bancorp for $528,000.  His initial interest rate was 9.125%.  The loan was an adjustable rate balloon note, and the interest rate could adjust up to 11.95%.

242.    Torres's second loan was for $66,000 from Alliance Bancorp.  The initial interest rate was 12.5%.

243.    Torres's third loan was for $87,500 from Pablo Curiel.  Tran explained to Torres that approximately $20,000 of that loan was paid to Defendants as "upfront interest."  The loan is interest only for two years, which is due in monthly installments of $729.17, after which time a balloon payment of the entire loan amount would have been due.

244.    Every month following the signing of the loan documents Torres had severe difficulties trying to make his monthly payments.  Because of the stress of trying to make such high monthly loan payments Torres was hospitalized in Santa Clara County Valley Medical Center Hospital for two days.

245.    In June of 2008, the Torres family lost the home in foreclosure.  Since that time, they have been essentially homeless, living in an illegally converted garage, with no heat and no kitchen.  The family of four has looked for more suitable housing, but because of bad credit has been unsuccessful.

**Plaintiff Raul Gonzalez**

246.    Raul Gonzalez purchased the home located at 5427 Vauxhall Circle, San Jose, CA 95008, with the assistance of Valdovinos and Tran.

247.    On or about January 2006 Gonzalez went to see Valdovinos with his girlfriend, Margarita Narvaez, and his nephew, Andres Gallego.  They intended to purchase the home together.

248.    Valdovinos said she was going to run a credit check on Gonzalez, Narvaez, and Gallego's credit, and after doing so informed them that Gonzalez had the best credit and would be the

Case: 09-05252    Doc# 1    Filed: 09/24/09    Entered: 09/24/09 14:28:32    Page 43 of 40
SV 346,441,960v1

only person eligible to apply for a loan for the house. This entire meeting and all other conversations related to the loan were conducted in the Spanish language only.

249. Gonzalez, Narvaez, and Gallego left, and for the next four months continued to look for houses that they could afford with the help of Valdovinos's romantic and business partner, Chavez.

250. When Gonzalez found a house that he wanted to purchase, Valdovinos referred him to Tran. Gonzalez went to Tran's office in approximately April 2006 and she asked him questions about his income for the loan application. Gonzalez told Tran that he made $2,800 per month, and could afford monthly mortgage payments of no more than $3,000 per month.

251. Tran informed Gonzalez that he qualified for two home loans based on his application. Gonzalez signed the loan documents and left the meeting with an understanding that he had signed documents for two bank loans.

252. A few days later, in early May 2006, Tran called Gonzalez and Narvaez back to her office and informed them that the bank had not qualified Gonzalez to borrow as much money as he needed, and that there was $60,000 that Gonzalez still needed to borrow to be able to purchase the home.

253. Tran told them that they had already committed to the first two loans, and that to borrow the rest of the money they needed to get a third loan with a private individual. Tran told Gonzalez and Narvaez that the third loan would have to be for $86,250 instead of the $60,000 that they needed because this loan came with "pre-paid interest." In addition, the third loan would have a 10% monthly interest payment.

254. Gonzalez did not want to sign for the third loan but was told that because he had already committed to the first two loans he had to sign for the third loan. Feeling that he had no choice, Gonzalez signed a straight note for a loan from Pablo Curiel for $86,250.

255. Valdovinos and Tran did not provide proper loan disclosures to Gonzalez, nor with disclosures translated into Spanish.

256. Gonzalez's loan application, dated May 15, 2006, was falsified in several respects by Tran. The application falsely listed Gonzalez's monthly income as $14,856, when is income is

SV 346,441,960v1

actually $3,000.  The application listed that he had savings of $85,000, as well as other assets worth $45,000 $38,000 and $85,000.  All of this information is false.  Unbeknownst to Gonzalez, Tran falsified Gonzalez's loan application to reflect that he made $14,000 per month as a painter.

257.    Defendant Tran also arranged for Gonzalez to pay approximately $900 for homeowners insurance through Paul Curiel.  Gonzalez was never informed of or consented to the homeowner's insurance policy, and did not have the opportunity to negotiate its terms.

258.    Tran falsified Gonzalez's loan application, misrepresented the loan terms to Gonzalez, and did not fully disclose other material loan terms to him.  For example, Gonzalez's second loan through National City Bank has a balloon payment of $79,994 after 15 years.

259.    Gonzalez has suffered damages because of Tran and Valdovinos' misrepresentations.

260.    Gonzalez's first loan was from Countrywide Bank for $517,500.  This is an adjustable rate loan with an initial interest rate of 7.50%.  The initial payment on this loan was $1,434.37.

261.    Gonzalez's second loan was from National City Bank in the sum of $103,200.  The initial interest rate was 8.00%.  The initial loan payment on this loan was $757.25.  The loan also carried a large balloon.

262.    Gonzalez's third loan was provided Pablo Curiel for $86,250.  This loan included "prepaid interest" plus an interest rate of 10%.  The loan also carried a two-year balloon.

263.    In February 2008, Gonzalez lost his home in foreclosure.  He has struggled finding adequate housing since that time due to his poor credit.

## III.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
11 U.S.C. § 523(a)(2)(A)
False Pretenses, False Representations, Actual Fraud

264.    Plaintiffs incorporate herein by reference all of the preceding allegations of this Complaint.

265.    Defendant made false promises and misrepresentations to Plaintiffs as alleged above, including, but not limited to, misrepresentations in the loan application, misrepresentations in the number of loans being taken out, misrepresentations regarding the terms of the loans,

- 35 -

Case: 09-05252    Doc# 1    Filed: 09/24/09    Entered: 09/24/09 14:28:32    Page 42 of 40
SV 346,441,960v1

misrepresentations regarding Plaintiffs' ability to qualify and afford payments under these loans, and misrepresentations and failures to disclose the true costs and fees related to the loans and the placement of insurance on their properties.

266. Defendant intentionally concealed from Plaintiffs the true nature of the loans and did so to deceitfully induce them into entering the transactions. Defendant's true intention was to close the loans that would enrich herself through fees that she would receive from lenders. Defendant knew that the Plaintiffs could not afford the monthly mortgage payments and would require refinancing, which would enrich her more because she earned fees with each refinance transaction that she closed. Defendant knew that ultimately the Plaintiffs would not be able to remain in the homes.

267. Defendant made these false statements and representations with the knowledge that they were false, with the intent to deceive Plaintiffs, and with the knowledge that Plaintiffs would rely on them. Plaintiffs relied on Defendant's false statements and misrepresentations, and they were reasonable and justified in relying on said representations and nondisclosures because the Plaintiffs were unsophisticated regarding real estate transactions, and Defendant was experienced in real estate dealings. Plaintiffs had a right to rely on said representations. Absent those misrepresentations, Plaintiffs would not have entered into the transactions.

268. As a result of Defendant's fraudulent misrepresentations and omissions, Plaintiffs have sustained damages in an amount to be determined at trial.

269. Defendant's conduct as alleged herein was a substantial factor in causing the damages sustained by Plaintiffs, and as a direct, proximate, and legal result of the above alleged fraudulent representations and omissions, Plaintiffs have suffered and will continue to suffer damages in an amount to be proven at trial, including, but not limited to, damages for loss of property and money and damages for emotional distress.

270. Based on the foregoing, this Court should find that the debts owed by Defendant to Plaintiffs are exempt from discharge pursuant to 11 U.S.C. section 523(a)(2)(A).

//

//

Case: 09-05252     Doc# 1     Filed: 09/24/09     Entered: 09/24/09 14:28:32     Page 36 of 40

SV 346,441,960v1

## SECOND CLAIM FOR RELIEF
### 11 U.S.C. § 523(a)(4)
### Fraud as a Fiduciary

271.    .Plaintiffs incorporate herein by reference all of the preceding allegations of this Complaint.

272.    .California law imposes on real estate agents and mortgage brokers, as fiduciaries, the same obligations of undivided service and loyalty that it imposes on a trustee in favor of a beneficiary.  This fiduciary duty is non-delegable by a mortgage broker in California.

273.    Defendant owed Plaintiffs fiduciary duties of the utmost loyalty, good faith, and diligence.  Defendant breached those fiduciary duties by, inter alia:

    a.    failing to inform Plaintiffs about onerous loan terms, such as prepayment penalties, negative amortization, and balloon payments;

    b.    failing to provide documents in Spanish;

    c.    failing to explain the terms of the loans to Plaintiffs;

    d.    inducing Plaintiffs to sign the loans by threatening them that they would lose their deposit;

    e.    falsifying employment status and assets of Plaintiffs;

    f.    inducing Plaintiffs to enter transactions by misrepresenting the terms of the loans;

    g.    steering Plaintiffs to inferior loan products that yielded higher commissions to Defendant;

    h.    failing to disclose adequately the terms and nature of the relationship between the defendants in the Federal Court Action;

    i.    charging Plaintiffs excessive and unearned broker fees; and

    j.    taking proceeds directly from the loan proceeds.

274.    Defendant engaged in her conduct alleged in this Complaint for her own financial interests, and in callous disregard for the foreseeable and inevitable financial consequences to the Plaintiffs.

275.    Defendant operated as an agent of Absolute, Palacio, and Tara, and abandoned her fiduciary duty to Plaintiffs.

276.     Defendant failed to act diligently by failing to evaluate the Plaintiffs' ability to repay the loans, failing to disclose all material terms of the transaction, and failing to comply with applicable consumer protections.

277.     As a result of Defendant's breach of her fiduciary duties to Plaintiffs, Plaintiffs have sustained damages in an amount to be proved at trial.

278.     Defendant's conduct as alleged herein was a substantial factor in causing the damages sustained by Plaintiffs, and as a direct, proximate, and legal result of the above alleged breach of fiduciary duty, Plaintiffs have suffered and will continue to suffer damages in an amount to be proven at trial, including, but not limited to, damages for loss of property and money and damages for emotional distress.

279.     Plaintiff is informed and believes, and thereon alleges, that Defendant is guilty of malice, fraud, or oppression, as defined in Cal. Civil Code section 3294, and where appropriate, Plaintiff should therefore recover, in addition to actual damages, damages to make an example of and punish the Defendant.

280.     Based on the foregoing, this Court should find that the debt owed by Defendant to Plaintiffs is nondischargeable under 11 U.S.C. section 523(a)(4).

### THIRD CLAIM FOR RELIEF
11 U.S.C. § 523(a)(6)
Willful and Malicious Injury

281.     Plaintiffs incorporate herein by reference all of the preceding allegations of this complaint.

282.     Defendant, in doing the acts alleged above, acted willfully and maliciously to injure Plaintiff, by converting for her own use and enjoyment, money or property rightfully belonging to the Plaintiffs (e.g., mortgage proceeds, equity from the home, and deposits).  Because of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial.

283.     In doing the acts herein alleged, Defendant acted with oppression, fraud,  and malice, and Plaintiffs are entitled to punitive damages in a sum according to proof.

284.     The debts of Defendant to Plaintiff for the actions above are exempt from discharge pursuant to 11 U.S.C. section 523(a)(6).

Case: 09-05252    Doc# 1    Filed: 09/24/09    Entered: 09/24/09 14:28:32    Page 48 of 40

## FOURTH CLAIM FOR RELIEF
### 11 U.S.C. § 727(a)(3)
#### Concealment, Destruction, or Mutilation of Records

285.    On information and belief, Defendant has concealed, destroyed, mutilated, falsified, or failed to keep or preserve books, records, documents and papers, including books, documents, records and papers from which Defendant's financial condition or business transactions might be ascertained.

286.    Defendant has failed and refused to provide Plaintiff copies of her individual and corporate tax returns for the 2008 tax year, as required by 11 U.S.C. section 521(e)(3)(A)(ii) and Interim Rule 4002(b)(4).

287.    Defendant Tran has concealed records by repeatedly failing and refusing to produce documents, which the Court has ordered her to produce.

288.    Defendant Tran's discharge should be denied under 11 U.S.C. section 727(a)(3) because she has concealed records.

## FIFTH CLAIM FOR RELIEF
### 11 U.S.C. § 727(a)(6)(A)
#### Failure to Obey Lawful Order of the Court

289.    Defendant has  refused in this case to obey the lawful order of this Court, to wit, the orders dated July 13, 2009, under which this Court ordered Defendant to "appear for examination concerning the acts, conduct, and property of the Debtor, the liabilities and financial condition of the Debtor, matters which affect the administration of the Debtor's estate, the Debtor's right to a discharge, the Debtor's income and other matters set forth in Fed.  R. Bankr. P. 2004(b)."

290.    Defendant was further ordered to "produce at the time and location of the examination the documents requested on Exhibit 'A' attached to the Movant's Application, pursuant to Fed. R. Bankr. P. 2004(c)."  Defendant has refused to obey this order of the Court.

291.    Defendant failed to meaningfully appear, as she did not bring many of the documents, and refused to obtain them.

292.    Further, she was unavailable for an adequate amount of time to conduct the 2004 exam, and on August 18, 2009, both parties agreed to continue the exam to a later time and date.

293.    Defendant has refused to re-appear for a continued 2004 exam.

294.     The discharge of Defendant should be denied under 11 U.S.C. section 727(a)(6)(A).

WHEREFORE, Plaintiffs pray that the Court determine that the debts owed to Plaintiffs are nondischargeable, that Plaintiffs have judgment against Defendant in an amount to be determined at trial, that this Court award Plaintiffs punitive damages according to proof, that Plaintiffs have such other further relief as is just, including reasonable costs and attorney fees, that this discharge of the Debtor from her debts be denied, and that Plaintiffs be awarded such other and further relief as the Court deems just and proper.

Dated:  September _24, 2009                    GREENBERG TRAURIG, LLP


                                               By:/s/_____
                                                    William J. Goines
                                                    Karen Rosenthal
                                                    Cindy Hamilton

                                               FAIR HOUSING LAW PROJECT

                                               By:/s/_____
                                                    Kyra Kazantzis
                                                    Annette Kirkham
                                                    Jessica Fry


                                               Attorneys for Plaintiffs

**<u>DEMAND FOR JURY TRIAL</u>**

Pursuant to Federal Rule of Civil Procedure 38(b) and Federal Rule of Bankruptcy Procedure 9015, Plaintffs hereby demand a trial by jury.


Dated:  September _24, 2009
                                               FAIR HOUSING LAW PROJECT

                                               By:/s/_____
                                                    Kyra Kazantzis
                                                    Annette Kirkham
                                                    Jessica Fry


                                               Attorneys for Plaintiffs

COMPLAINT OBJECTING TO DISCHARGE AND
DISCHARGEABILITY OF DEBT
BANKRUPTCY NO. 09-54184

SV 346,441,960v1

Case: 09-05252     Doc# 1     Filed: 09/24/09     Entered: 09/24/09 14:28:32     Page 40 of 40